[Cite as *R.T. v. Knobeloch*, 2018-Ohio-1596.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| R.T. et al., | : | |
| Plaintiffs-Appellees, | : | |
| v. | : | No. 16AP-809 |
| | | (C.P.C. No. 14CV-4879) |
| William Knobeloch, M.D. et al., | : | |
| | | (REGULAR CALENDAR) |
| Defendants-Appellants. | : | |

## D E C I S I O N

### Rendered on April 24, 2018

**On brief:** *Hale Westfall, LLP,* and *Allan L. Hale*; *Burg Simpson Eldredge Hersh & Jardine PC, Calvin S. Tregre* and *Janet G. Abaray*, for appellees. **Argued:** *Peter J. Krumholz.*

**On brief:** *Arnold Todaro & Welch, Grier D. Schaffer* and *Gregory B. Foliano*, for appellants. **Argued:** *Grier D. Schaffer.*

APPEAL from the Franklin County Court of Common Pleas

TYACK, J.

{¶ 1} William Knobeloch, M.D., American Health Network, Inc., American Health Network of Ohio Care Organization, LLC, and American Health Network of Ohio Professional Corp. ("appellants"), are appealing the jury verdict of the Franklin County Court of Common Pleas awarding damages to appellee, S.T., a minor, by and through her mother and next friend, R.T. For the following reasons, we affirm the judgment of the Franklin County Court of Common Pleas.

## I. FACTS AND CASE HISTORY

{¶ 2} This case arises from the treatment of then six year old S.T. by Dr. Knobeloch, a pediatrician, in the summer of 2012. S.T. was presenting significant behavioral issues in

kindergarten which led to a consultation with Dr. Knobeloch.  On June 4, 2012, Dr. Knobeloch referred S.T. for counseling with Karen Cowie, LSW.

{¶ 3}  On July 31, 2012, S.T. and her mother met with Dr. Knobeloch for a behavioral consultation.  Dr. Knobeloch gave a diagnosis of anxiety and panic disorder but did not rule out pediatric bipolar disorder.  S.T. was prescribed 10 mg of Prozac.  While the Prozac did seem to make some improvement in S.T.'s behavior, new behavior problems arose.

{¶ 4}  On August 21, 2012, R.T. and Dr. Knobeloch discussed S.T.'s behavior.  Dr. Knobeloch spoke with Ms. Cowie who indicated it was her impression that there were instances of mania being exhibited.  Dr. Knobeloch, with this new information, now determined a different diagnosis of bipolar disorder though there was a question of whether Dr. Knobeloch told R.T. this new diagnosis.  Dr. Knobeloch instructed R.T. to immediately stop giving the Prozac to S.T. and begin administering Lamictal with a one-time daily dose of 25 mg.  Lamictal is an anti-epileptic drug that has been used off-label to treat pediatric bipolar disorder.

{¶ 5}  On September 4, 2012, Dr. Knobeloch increased the dosage of Lamictal to 50 mg per day after his nurse spoke to R.T. about S.T.'s behavior.  On September 5, 2012, S.T. was seen by Dr. Knobeloch' s partner, Brad Pfau, M.D.  S.T. had what Dr. Pfau called bug bites and some sort of eye infection that blurred her vision and produced swollen dry eyes. S.T. was prescribed antibiotics as treatment.  R.T. expressed her concern that the problems with S.T.'s eyes were related to the Lamictal.

{¶ 6}  On September 7, 2012, S.T. was seen by Dr. Knobeloch.  S.T. had redness and swelling around her eyes with a greenish discharge, had oral ulcers, and was covered in a target rash, which appeared as little bullseyes.  R.T. also stated that S.T. had developed a high fever.  Dr. Knobeloch diagnosed S.T. with Stevens-Johnson Syndrome ("SJS"), a serious rash that develops painful sores and in which the skin sloughs off.  SJS exhibits a targeted rash and the involvement of two mucus membranes, the eyes and mouth in this case.  S.T. was taken directly to Nationwide Children's Hospital where she remained from September 7, to October 1, 2012.  S.T. had to be placed in a medically induced coma to combat the pain of her skin sloughing off.

{¶ 7}   On May 6, 2014, appellees filed suit against Dr. Knobeloch, American Health Network, Inc., and CVS pharmacy, claiming among others, medical malpractice, negligence, and a lack of informed consent. The claims centered on Dr. Knobeloch's improper prescription of Lamictal which allegedly proximately caused SJS.

{¶ 8}   On August 15, 2016, a jury trial began and, over two weeks later, the jury returned a verdict. It found that Dr. Knobeloch had been negligent and there was a lack of informed consent while finding no liability as to CVS. The total verdict was $1,578,539.51. A remittitur reduced the verdict to $1,028,539.51.

{¶ 9}   On October 31, 2016, the verdict was journalized creating a final appealable order. Appellants timely appealed.

## II. ASSIGNMENTS OF ERROR

{¶ 10}   Appellants bring seven assignments of error for our consideration:

> I. The trial court gave two improper jury instructions and failed to give a third instruction, which is prejudicial error.
>
> II. The court's repeated, leading, invasive interrogation of, and instructions to four of Plaintiffs' experts violated Evid.R. 614(B) and destroyed Defendants' right to receive a fair, impartial trial.
>
> III. The improper exclusion of liability expert, David Franz, M.D., denied Defendants a fair trial, prejudiced the defense before the jury and prohibited presentation of new, material evidence as represented in opening statement.
>
> IV. The court committed prejudicial error by submitting the unsupported informed consent claim to the jury and by overruling Defendants' repeated motions for directed verdict.
>
> V. The jury had no competent evidence to find that Dr. Knobeloch's negligence caused harm by "doubling the patient's dose of Lamictal without seeing the patient."
>
> VI. The court erred by admitting prejudicial, scientifically unreliable, misleading testimony that the dosage of Lamictal proximately caused this patient's SJS and by denying our repeated motions for a directed verdict.
>
> VII. The court erred by admitting testimony of Drs. Kaye and Arrendondo, as their legal competency was never established pursuant to Evid.R. 601(D).

## III. THE TRIAL COURT DID NOT ERR IN GIVING THE JURY INSTRUCTIONS

{¶ 11} We will address the assignments of error in logical groupings. In the first assignment of error, appellants argue the trial court improperly gave jury instructions on the lack of informed consent and instructions on the Federal Drug Administration's ("FDA") "Black Box" warning. Appellants also argue the trial court erred in failing to give a failure to mitigate damages instruction to the jury.

{¶ 12} A trial court has discretion in deciding whether to give or refuse a particular instruction, and an appellate court will not disturb that decision absent an abuse of discretion. *Clark v. Grant Med. Ctr.*, 10th Dist. No. 14AP-833, 2015-Ohio-4958, ¶ 50. Requested instructions should be given if they are correct statements of the law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the instruction. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991).

{¶ 13} "However, when a jury instruction contains an incorrect statement of the law, a reviewing court applies a mixed de novo and abuse of discretion standard of review." *State v. Teitelbaum*, 10th Dist. No. 14AP-310, 2016-Ohio-3524, ¶ 127, citing *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 21, citing *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93 (1995). Thus, "[i]n examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' " *Kokitka* at 93, quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990). However, in reviewing "the instructions as a whole, and, if taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled." *State v. Shepard*, 10th Dist. No. 07AP-223, 2007-Ohio-5405, ¶ 7, citing *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist.1993). "In reviewing a record to ascertain the presence of sufficient evidence to support the giving of a special instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." *Feterle v. Huettner*, 28 Ohio St.2d 54 (1971), syllabus.

### A. DISCLOSURE IS REQUIRED TO GIVE INFORMED CONSENT

{¶ 14} Appellees argue that, because appellants offered their own jury instruction as to informed consent, they cannot now complain that the trial court should not have given one under the invited-error doctrine. Under the invited-error doctrine, "[a] party will not be permitted to take advantage of an error which he himself invited or induced." *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co., Lincoln-Mercury Div.,* 28 Ohio St.3d 20 (1986). While appellants did offer a proposed instruction as to informed consent that was reviewed by the trial court, it is not in the record. Without the language of the proposed instruction, we cannot determine whether appellants invited or induced the error they now complain of.

{¶ 15} The doctrine of informed consent emerged in the context of the tort of battery. The theory was that failure to obtain informed consent violates the right that every competent human has, a right to determine what is to be done to their body. *Bedel v. Univ. of Cincinnati Hosp.*, 107 Ohio App.3d 420, 427 (10th Dist.1995). The doctrine of informed consent has never required that the physician, prior to administering the treatment, fully inform the patient of all potential risks. *Id.*, citing *O'Brien v. Angley*, 63 Ohio St.2d 159 (1980).

> The tort of lack of informed consent is established when:
>
> (a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
>
> (b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
>
> (c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.

*Nickell v. Gonzalez*, 17 Ohio St.3d 136 (1985), syllabus.

{¶ 16} The lack of informed consent jury instruction given in this case states:

> LACK OF INFORMED CONSENT: DEFENDANT WILLIAM KNOBELOCH, M.D.
>
> Plaintiffs claim that Defendant Dr. Knobeloch breached the standard of care by failing to inform them about his treatment

of his diagnosis of bipolar disorder, and the risks and benefits of the drug Lamictal he prescribed for [S.T.] To demonstrate lack of informed consent, [appellees] must prove by a greater weight of the evidence that:

(A) Defendant Dr. Knobeloch failed to disclose and discuss the material risks and dangers inherently and potentially involved with his treatment of his diagnosis of bipolar disorder, and the risks and benefits of the drug Lamictal; and

(B) the risks and dangers that should have been disclosed actually occurred and were a proximate or direct cause of injuries, harm, or loss to the Plaintiffs; and

(C) a reasonable person in the Plaintiffs' position would have decided against taking Lamictal if the material risks and dangers inherent and incidental to it had been disclosed.

(Aug. 31, 2016 Jury Instructions at 9-10.)

{¶ 17} Appellants not only argue there was no testimony as to what constitutes the proper standard of care in order to give informed consent, they also argue the instructions improperly contained the phrase "of his diagnosis of bipolar disorder." Appellants argue that the instructions improperly focused the jury on a factual untruth that Dr. Knobeloch did not tell R.T. he was treating S.T. for bipolar disorder with Lamictal. This argument is not well-taken. The jury instruction does not state whether Dr. Knobeloch informed R.T. of his diagnosis of bipolar disorder. The focus of the instruction is whether Dr. Knobeloch discussed the material risks and dangers inherently and potentially involved with the treatment.

{¶ 18} Appellants argue there was no testimony from appellees' experts as to what the standard of care should have been to give proper informed consent stating that it was misleading and improper to submit the unsupported informed consent claim to the jury. This argument is a mischaracterization of the law. The first prong of a lack of informed consent claim requires appellees to present evidence that a physician failed to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy. *Nickell* at syllabus. The jury instruction properly states that appellees must prove that "Dr. Knobeloch failed to disclose and discuss the material risks and dangers inherently and potentially involved with his treatment of his

diagnosis of bipolar disorder, and the risks and benefits of the drug Lamictal." (Aug. 31, 2016 Jury Instructions at 10.)

{¶ 19} The remaining question is whether appellees presented competent and credible evidence that Dr. Knobeloch failed to disclose to R.T. and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy of prescribing Lamictal for a diagnosis of pediatric bipolar disorder.

{¶ 20} R.T. testified at trial that, on August 21, 2012, Dr. Knobeloch called her after talking to Ms. Cowie who had seen S.T. the previous day. R.T. was very concerned about S.T.'s behavior and her reaction to Prozac. Dr. Knobeloch instructed her to immediately stop administering Prozac and begin Lamictal:

Q. What were you told by Dr. Knobeloch that day?

A. Dr. Knobeloch said that he had spoken with Karen Cowie and that he was going to prescribe a medication that would help stabilize her mood.

* * *

Q. What were you told about Lamictal?

A. I was just told that it was a drug that was going to be used to calm her down, to take away the side effects from the Prozac that she was having.

Q. Did he tell you about the risks and benefits of Lamictal?

A. No, he did not.

Q. Did he tell you about any other alternatives?

A. No, he did not.

Q. Had he told you about any other drugs?

A. No.

Q. What about the alternatives of taking nothing?

A. He did not.

* * *

Q. What were you told about the dosage of Lamictal?

A. We did not discuss a dosage.

Q. Did Dr. Knobeloch ask to see [S.T.]?

A. No.

Q. What did he tell you about the dose he was prescribing for Lamictal?

A. He didn't discuss a dosage.  He didn't tell me.

* * *

Q. Did he tell you about any possible adverse reactions and what to look for?

A. No.  No, he did not.

Q. What did he say about the black box warning?

A. He never discussed the black box warning.

(July 22, 2016 Tr. 117-20.)  A "black box" warning from the FDA is the strongest warning for an FDA-approved drug indicating a risk of very serious harm or death. *Howland v. Purdue Pharma L.P.*, 104 Ohio St.3d 584, 2004-Ohio-6552, ¶ 6.  Again, R.T. further testified that Dr. Knobeloch failed to disclose any risks or dangers in taking Lamictal:

Q. Were you advised by Dr. Knobeloch that [S.T.] was being given an overdose?

A. No, I was not.  I never would have given it to her.  Never.

* * *

Q. Did Dr. Knobeloch tell you about the risks and benefits of Lamictal?

A. No, he did not.

Q. Did he tell you about any alternatives to Lamictal or other drugs?

A. No.

Q. What about alternatives of doing nothing?

A. No.

(Aug. 26, 2016 Tr. Vol. II at 127.) Dr. Knobeloch testified that he explained the risks and benefits of Lamictal, and that there was a risk of SJS and he explained what the black box warning was, but he admitted he did not indicate he was using the drug off label:

Q. Okay. And I think you told us that you spoke with [R.T.] about the risks and benefits of Lamictal?

A. Correct.

Q. In fact, you told us that you explained what Stevens-Johnson syndrome was, and there was a risk of taking Lamictal, correct?

A. Correct.

Q. But you've gotten no written record reflecting what you told her about that?

A. That's correct.

Q. And you prescribed Lamictal for anxiety and panic disorder, correct?

A. I did not. I prescribed it for bipolar.

* * *

Q. So I guess here's my question then: You prescribed the Prozac for anxiety and panic disorder, and now you're looking for a mood stabilizer, right?

A. I'm following you, yes.

Q. The mood stabilizer, this is for bipolar I disorder, correct?

A. Correct.

Q. And that's why you choose Lamictal?

A. Correct.

Q. Did you explain to R.T. that you were using this drug off label?

A. I did not.

Q. Okay. So you prescribed - - you told her what SJS was, correct?

A. Correct.

Q. And sort of the gist of the black box warning?

A. Correct.

Q. But you didn't explain to her that you were using it off label?

A. That's correct.

Q. For use that had not been indicated for pediatric patients on the manufacturer's label, correct?

A. That's correct.

Q. Did you consider that and decide that she didn't need that information or that that was too much information?

A. No.

(Aug. 23, 2016 Tr. Vol. VII at Tr. 1464-66.) Dr. Knobeloch did not discuss the specifics of the dosing of Lamictal that was prescribed for S.T. at nearly four times the recommended dosage by the manufacturer's guidelines:

Q. Okay. You didn't go into the specifics of dosing with [R.T.], correct?

A. Correct.

Q. You didn't tell her that the 25-milligram dose of Lamictal per day you prescribed for [S.T.] was nearly four times of what had been recommended by the manufacturer in its guidelines, correct?

A. Correct.

(Aug. 23, 2016 Tr. Vol. VII at 1470.)

{¶ 21} Appellees presented evidence that Dr. Knobeloch failed to disclose or discuss *any* risks or dangers with R.T.  The jury, as the trier of fact, can determine independently of expert medical testimony whether there was any disclosure or discussion of any risks or dangers.  "It is true that a determination of whether a patient consents to a treatment does not necessarily require expert testimony."  *Fernandez v. Ohio State Pain Control Ctr.*, 10th Dist. No. 03AP-1018, 2004-Ohio-6713, ¶ 12.

{¶ 22} If the jury determines there was no disclosure or discussion, as in this case, then whether a risk was material or not is inconsequential to the first prong of a claim of a lack of informed consent.  To put it another way, if there was no disclosure of the risks and dangers then no further evidence is needed to determine if a non-existent disclosure touched on all material risks.

{¶ 23} There are two considerations here: the material risks and dangers and the significance of those risks and dangers.  *White v. Leimbach*, 131 Ohio St.3d 21, 2011-Ohio-6238, ¶ 37.  The first consideration is that "[e]xpert medical testimony is required to establish the material risks and dangers inherently and potentially involved with a medical procedure."  *Id.*  Here, there is abundant expert medical testimony in the record of the dangers of taking Lamictal and the deadly risks of SJS.  The second consideration is "what a reasonable patient would have done in light of these disclosed risks is determined by the trier of fact."  *Id.*  If a jury could determine there was no disclosure of any risk, let alone the material ones, then no medical expert testimony is required to determine if a non-existent disclosure was medically sufficient to truly make the patient aware of the risks and dangers.

{¶ 24} We have previously found that "[e]xpert testimony is required to support an allegation that a treating or consulting physician did not tell the patient *enough* about the medication being prescribed."  (Emphasis added.)  *Anderson v. Eli Lilly & Co.*, 10th Dist. No. 15AP-479, 2015-Ohio-5239, ¶ 22.  In the case at bar, we need not determine whether Dr. Knobeloch disclosed *enough* information about the risks to R.T. because there is competent and credible evidence from which the jury could find that Dr. Knobeloch did not disclose *any* information.  Appellees established sufficient evidence to satisfy the first prong of a claim of a lack of informed consent to support submitting that claim to the jury.

{¶ 25} There was evidence that the second prong of a lack of informed consent claim was also satisfied.  "Expert medical testimony is also required to establish that an

undisclosed risk or danger actually materialized and proximately caused injury to the patient." *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-999, 2013-Ohio-5140, ¶ 107, citing *White* at ¶ 38. There is extensive and detailed expert testimony in the record that there is a risk that Lamictal can cause SJS and was the proximate cause of S.T.'s injuries. Dr. Kaye testified extensively about the risks and dangers of Lamictal and how it relates to this case and gave opinions to a reasonable degree of medical probability about Dr. Knobeloch's actions:

> A. Dr. Knobeloch should have counseled the family on any risks and benefits of a drug he chooses to prescribe. When a drug has a black box warning, he's obligated to an even greater extent.
>
> * * *
>
> Q. And what's the basis of that opinion, sir?
>
> A. The basis of that opinion is that Dr. Knobeloch did not speak to [S.T.]'s family about the risks and benefits of the drug, nor did he speak to the degree of a black box warning about the potential catastrophic side effect of the skin rash that we talked about.

(Aug. 17, 2016 Tr. Vol. III at 561-62.)

{¶ 26} Appellees also established the third prong of the lack of informed consent claim. R.T. testified:

> Q. What did he say about the black box warning?
>
> A. He never discussed the black box warning. Had he mentioned the black box warning, I would have never given [Lamictal] to her. I would have taken her to the hospital.
>
> Q. What would you have done if you had been told that the dose of Lamictal prescribed for [S.T.] was 400 percent of what was recommended by the manufacturer and the FDA?
>
> A. I never would have given it her. No mother in her right mind would ever give her daughter an overdose of a medication on purpose. I never would have given it to her.

(July 22, 2016 Tr. at 120-21.) From R.T.'s testimony, the jury could conclude that a reasonable person in R.T.'s position would have decided against using Lamictal had any risks and dangers been disclosed prior to the therapy.

{¶ 27} There exists in the record sufficient evidence that reasonable minds might reach the conclusion that there was a lack of informed consent. The trial court did not abuse its discretion in coming to this conclusion that the instructions contained the correct statements of law applicable to the facts in this case.

## B. THE FDA'S WARNING CAN BE EVIDENCE OF CAUSATION

{¶ 28} Appellants also argue that the trial court erred in giving a jury instruction that the FDA warnings establish that a drug is a probable cause of a condition warned of by the FDA. Appellants state that the FDA warns of mere possibilities and the warnings alone do not establish that the drug is the probable cause of a condition warned of.

{¶ 29} The jury instruction in question states:

> ### FDA WARNINGS AND PROXIMATE CAUSE
>
> In this case there was evidence presented concerning the Food and Drug Administration (FDA) warnings for medications prescribed to [S.T.]. The FDA approved warnings standing alone cannot provide evidence of proximate cause but may be considered in determining whether proximate cause has been established.

(Aug. 31, 2016 Jury Instructions at 11-12.) Appellants claim that this instruction is improper and allows jurors to accept a standard of causation less than 51 percent by allowing the FDA warning to be considered in determining proximate cause. This argument is not well-taken. The jury instruction does not allow a lesser standard than a preponderance of evidence to be applied. It merely states that evidence of the warning may be considered on the issue of causation.

{¶ 30} Further, the immediately preceding jury instruction specifically states that "[y]ou will not reach the issue of proximate cause if you do not find by a preponderance of the evidence that [Appellants] were negligent." (Aug. 31, 2016 Jury Instructions at 11.) The trial court did not abuse its discretion in allowing this jury instruction.

## C. LACK OF A MITIGATION OF DAMAGE INSTRUCTION

{¶ 31} Appellants argue that the trial court erred in not allowing a failure to mitigate damage instruction be submitted to the jury. Appellants claim that S.T. has stopped treatment for her underlying psychiatric condition which should be continued to be treated to mitigate the harm caused by SJS.

{¶ 32} In reviewing a trial court's jury instruction, an appellate court determines whether the trial court abused its discretion in refusing to give a requested instruction under the facts and circumstances of the case. *State v. Gover*, 10th Dist. No. 05AP-1034, 2006-Ohio-4338, ¶ 22, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). We recognize a three-part test to determine when the trial court commits reversible error in failing to give a requested instruction: "(1) the proposed instruction must be a correct statement of the law; (2) the proposed instruction must not be redundant of other instructions given; and (3) the failure to give the proposed instruction impaired the theory of the case of the party requesting it." *Gower v. Conrad*, 146 Ohio App.3d 200, 203 (10th Dist.2001); *State v. Dodson*, 10th Dist. No. 10AP-603, 2011-Ohio-1092, ¶ 6.

{¶ 33} The trial court refused to give the proposed failure to mitigate jury instruction, noting the objection. The trial court reasoned that the duty to mitigate instruction was not relevant and that there was no evidence to support it. Appellants point to the testimony of Dr. Prince to support the instruction. When asked to a reasonable degree of medical certainty whether S.T. required any current psychiatric treatment, Dr. Prince answered that "from the records that I had to review and look at, I believe [S.T.] would benefit from some treatment." (Tr. 1576.) Then, when asked whether treatment would improve S.T.'s situation as opposed to no treatment at all, Dr. Prince responded only if someone wants to get help. "The difficulty is, if someone doesn't want to get help, just showing up and trying to do counseling is not going to be helpful. It's a collaborative interactive process. It's not passive like surgery or things like that." (Tr. at 1576.) The testimony bears no relevance to the issue of whether psychiatric treatment would mitigate the effect of SJS. This testimony does not show that the trial court abused its discretion in refusing to give instructions about appellees' failure to mitigate damages to the jury.

{¶ 34} The trial court did not improperly give jury instructions on the lack of informed consent and on the FDA warning, nor did the trial court err in failing to give a failure to mitigate damages instruction to the jury.

{¶ 35} The first assignment of error is overruled.

## IV. THERE IS SUFFICIENT EVIDENCE TO OVERCOME A MOTION FOR DIRECTED VERDICT

{¶ 36} In the fourth assignment of error, appellants argue there was insufficient evidence to support the jury's verdict on the claim of a lack of informed consent and that the trial court erred in denying a motion for directed verdict. Here, appellants bring many of the same arguments we rejected under the first assignment of error. We therefore examine whether the trial court improperly denied the motion for directed verdict.

{¶ 37} "According to Civ.R. 50(A)(4), a motion for directed verdict should be granted when, after construing the evidence most strongly in favor of the party against whom the motion is directed, 'reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.' " *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 14, quoting Civ.R. 50(A)(4), *reconsideration denied*, 109 Ohio St.3d 1483, 2006-Ohio-2466. "[A] motion for directed verdict tests whether the evidence is sufficient to warrant a jury's consideration, so in deciding whether to grant a directed verdict, a trial court considers neither the weight of the evidence nor the credibility of the witnesses." *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 8 (10th Dist.), citing *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, ¶ 31. " 'In deciding [a motion for directed verdict], the court must assume that the evidence presented by the non-movant is true and must give the non-movant the benefit of all reasonable inferences to be drawn from that evidence.' " *Koss v. Kroger Co.*, 10th Dist. No. 07AP-450, 2008-Ohio-2696, ¶ 15, quoting *Halk v. Cedarville College*, 2d Dist. No. 97-CA-75 (June 26, 1998).

{¶ 38} A motion for directed verdict only tests the sufficiency of the evidence. It presents a question of law that an appellate court reviews de novo. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 4. De novo appellate review requires that the court of appeals independently review the record and afford no deference to the trial court's decision. *Koss* at ¶ 16.

{¶ 39} Construing the evidence most strongly in favor of appellees, reasonable minds could not come to but one conclusion that is adverse to appellees. Appellees presented evidence that Dr. Knobeloch failed to disclose or discuss *any* risks or dangers

with R.T., there was extensive and detailed expert testimony in the record that there is a risk Lamictal can cause SJS and that the administration of Lamictal at the dosage prescribed was the proximate cause of S.T. 's injuries. There exists in the record sufficient evidence that reasonable minds might reach the conclusion that there was a lack of informed consent. The trial court did not improperly deny appellants' motions for directed verdict on the informed consent claim.

{¶ 40} The fourth assignment of error is overruled.

## V. THERE IS EVIDENCE OF THE CAUSAL CONNECTION BETWEEN LAMICTAL AND SJS

{¶ 41} In the sixth assignment of error, appellants argue that this case should not have been allowed to go to a jury because there is no reliable scientific evidence that the dosage of Lamictal given to S.T. caused SJS. Appellants argue that Dr. Kaye and other experts should have been prevented from giving their causal opinions that there is a probability of developing SJS from taking Lamictal.

{¶ 42} Evid.R. 702 governs the admissibility of expert testimony, and provides:

> A witness may testify as an expert if all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
>
> (2) The design of the procedure, test, or experiment reliably implements the theory;
>
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 43} Dr. Kaye's testimony related to matters beyond the knowledge of laypersons and, as will be discussed with respect to the seventh assignment of error, he was properly qualified as an expert.  Thus, we examine whether his opinion was reliable.

{¶ 44} "To determine whether a proposed expert's testimony about a scientific technique or a scientific methodology is scientifically reliable, the court focuses on factors identified by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) as adopted by the Supreme Court in *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611-12 (1998)."  *State v. Mobarak*, 10th Dist. No. 14AP-517, 2017-Ohio-7999, ¶ 20.  These factors are: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate or error, and (4) whether the methodology has gained general acceptance.  *Miller* at 611, citing *Daubert* at 593-94.  The focus of assessing reliability must generally be on principles and methodology, not on the conclusions that they generate.  Additionally, to be admissible, the expert testimony must assist the trier of fact in determining a fact issue or understanding the evidence.

{¶ 45} Appellants aver that Dr. Kaye's opinion must rest on FDA warnings as he does not prescribe Lamictal nor has he done any research with the drug.  Dr. Kaye earned his doctorate in pharmacology and teaches medicine specializing in anesthesia and pain.  Dr. Kaye is also on an advisory board for anesthesia, analgesics, and addiction products for the FDA which reviews new drugs, and whether there should be black box warnings or guidelines.  Dr. Kaye is also board certified in anesthesia and pain management.  Dr. Kaye has extensive training in pharmacology and is the author of journals and textbooks.  Dr. Kaye was qualified as an expert and his medical opinions do not rely only on the FDA "black box" warning as he has a career's worth of experience in pharmacology.  Moreover, Dr. Kaye need not have prescribed or researched a specific drug in order to assist the jury in understanding the evidence and he need not be the best witness on the subject.  *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159 (1978).

{¶ 46} Appellants argue SJS is not predictable and that a causal relationship between SJS and Lamictal is unproven.  Based on his education, experience, and training, Dr. Kaye explained that the FDA warned of a rash that would cause the skin to slough off.  When 10 percent of the skin sloughs off it is called Stevens-Johnson Syndrome.  S.T. had in

excess of 30 percent of her skin sloughing off which would classify as toxic epidermal necrolysis. The FDA warning had four aspects, the first one being unrelated to this case. The other three aspects (exceeding the recommended initial dose of Lamictal, exceeding the recommended dose escalation, and at the first sign of a rash to immediately discontinue Lamictal) all occurred in this case. Dr. Kaye explained that in a study of children ages 2 to 16, approximately 8 out of 1,000 showed risk of SJS with an increased dose of Lamictal.

{¶ 47} There was abundant evidence that the improper prescription of Lamictal caused SJS. Dr. Kaye explained that the dosage prescribed was three to four times the recommended dosage. The higher amounts of Lamictal in a child's body increases the possibility there would be toxicity. If too much Lamictal is given initially, it quickly increases the risk of toxicity. In S.T.'s situation, the amount given was so high that it had a toxic effect, and the doubling of the dose further compounded this toxic effect. Dr. Kaye also opined that failure to stop the drug at the first sign of a rash also increased the likelihood of SJS. There was evidence presented that there is a causal relationship between SJS and Lamictal. The FDA warning and the study referenced show there is a connection. The actions of Dr. Knobeloch in prescribing too high of an initial dose, then increasing that dose above recommended levels, and failing to stop prescribing Lamictal at the initial appearance of a rash, all increased the risk of SJS developing.

{¶ 48} Dr. Kaye was qualified to give expert testimony of the causal connection between Lamictal and SJS. He then proceeded to give evidence of such a connection and that the actions of Dr. Knobeloch increased the risk of SJS at multiple points during the treatment.

{¶ 49} The sixth assignment of error is overruled.

## VI. THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT

{¶ 50} In the fifth assignment of error, appellants argue there was no evidence presented that Dr. Knobeloch's failure to see S.T. before doubling the dose of Lamictal proximately caused injury.

{¶ 51} Appellants aver there is no competent evidence that failing to see S.T. on September 4, 2012 before increasing the dosage of Lamictal to 50 mg a day was a proximate cause of her injuries, sufficient to support the jury's affirmative answer to Jury

Interrogatory No. 2. The second jury interrogatory read: "If you found by a preponderance of the evidence that Defendant, William Knobeloch, M.D., fell below the standard of care, do you find by a preponderance of the evidence that any such deviation proximately caused injury to Plaintiff, [S.T.]?" (Aug. 31, 2016 Jury Interrogatory No. 2.) Appellants argue there is a lack of sufficient evidence to support the jury's verdict as a matter of law.

{¶ 52} Sufficiency of the evidence is the legal standard applied to determine whether the case should have gone to the jury. *Eastley v.* Volkman, 132 Ohio St.3d 328, 2012-Ohio-2179, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In other words, sufficiency tests the adequacy of the evidence and asks whether the evidence introduced at trial is legally sufficient as a matter of law to support a verdict. *Id.* If the evidence presented at trial is susceptible to more than one interpretation, we are bound to uphold the trial court's decision. *Estate of Barbieri v. Evans*, 127 Ohio App.3d 207 (9th Dist.1998).

{¶ 53} The second jury interrogatory does not specifically focus only on whether Dr. Knobeloch's failure to see S.T. on September 4, 2012 proximately caused her injuries. Rather, the jury was asked if whether it found by a "preponderance of the evidence that Defendant, William Knobeloch, M.D., fell below the standard of care, do you find by a preponderance of the evidence that *any* such deviation proximately caused injury." (Emphasis added.) (Aug. 31, 2016 Jury Interrogatory No. 2.) There was ample evidence that when viewed in a light most favorable to appellees, Dr. Knobeloch's deviation from the standard of care proximately caused S.T.'s injuries. We find there was legally sufficient evidence to support the jury's verdict on the second interrogatory.

{¶ 54} The fifth assignment of error is overruled.

## VII. THE TRIAL COURT DID NOT SHOW BIAS IN QUESTIONING WITNESSES

{¶ 55} In their second assignment of error, appellants argue that the trial court showed bias in comments and asking questions of appellees' expert witnesses that resulted in plain error in violation of Evid.R. 614(B).

{¶ 56} "The court may interrogate witnesses, in an impartial manner, whether called by itself or by a party." Evid.R. 614(B). "Because Evid.R. 614(B) imbues trial courts with the discretion to decide whether or not to question a witness, appellate courts must review any questioning by a trial court under the abuse of discretion standard." *Brothers v.*

*Morrone-O'Keefe Dev. Co., LLC*, 10th Dist. No. 05AP-161, 2006-Ohio-1160, ¶ 10, citing *State v. Johnson*, 10th Dist. No. 03AP-1103, 2004-Ohio-4842, ¶ 10. "The term 'abuse of discretion' connotes more than an error of law or judgment, it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 57} Evid.R. 614(B) allows the trial court to fulfill its obligation to control the proceedings before it, to clarify ambiguities, and to take steps to ensure substantial justice. *Brothers* at ¶ 11, citing *State v. Stadmire*, 8th Dist. No. 81188, 2003-Ohio-873, ¶ 26. Therefore a trial court should not hesitate to pose pertinent and even-handed questions to witnesses. *Id.* at ¶ 11.

{¶ 58} "Evid.R. 614(B), however, requires the court to question impartially and thus tempers a trial court's ability to question a witness." *Andrew v. Power Mkt. Direct*, 10th Dist. No. 11AP-603, 2012-Ohio-4371, ¶ 79, citing *Brothers* at ¶ 12. Therefore, in a jury trial where the intensity, tenor, range, and persistence of the court's interrogation of a witness can reasonably indicate to the jury the court's opinion as to the credibility of the witness or the weight to be given to the testimony, the interrogation is prejudicially erroneous. *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113 (1970), paragraph four of the syllabus. "[A]bsent ' "any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court acted with impartiality [in * * * [its] questions from the bench] in attempting to ascertain a material fact or to develop the truth." ' " *Brothers* at ¶ 12, quoting *State v. Baston*, 85 Ohio St.3d 418, 426 (1999), quoting *Jenkins v. Clark*, 7 Ohio App.3d 93, 98 (2d Dist.1982). "A trial court's questioning of a witness is not impartial merely because it elicits evidence that is damaging to one of the parties." *Id.* at ¶ 12, citing *Klasa v. Rogers*, 8th Dist. No. 83374, 2004-Ohio-4490, ¶ 32.

{¶ 59} "A judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions." *In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, ¶ 5, citing *In re Disqualification of Olivito*, 74 Ohio St.3d 1261 (1994). "[T]he term, 'biased or prejudiced,' when used in reference to a judge before whom a cause is pending, implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as

contradistinguished from an open state of mind which will be governed by the law and the facts." *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 469 (1956).

{¶ 60} Appellants cite multiple places in the record that purport to show the trial court's bias, prejudice, or the prodding of a witness was to elicit partisan testimony:

> Q. So now let's get to your opinions. Dr. Kaye, do you have an opinion about whether Lamictal has an indication for pediatric bipolar disorder?
>
> A. Lamictal has no indication for pediatric bipolar disease.
>
> THE COURT: When you give opinions, Doctor, you have to make sure all of your opinions are to a reasonable degree of medical certainty and probability, i.e., 51 percent or more likely. Will you make sure that all your opinions are within that degree?

(Aug. 23, 2016 Vol. 3 at Tr. at 554-55.) Here, the court was clarifying under what circumstances Dr. Kaye was permitted to express his medical opinion. The court reminded Dr. Kaye that he was limited to opinions supported by a reasonable degree of medical certainty and probability. This clarification can be interpreted as beneficial to appellants as well as the appellees.

{¶ 61} Appellants take issue with the court reminding appellees' counsel of the limitations of their witnesses' testimony and sustaining the appellants' objections:

> Q. And that the opinions you've given with respect to what happened as a result of those breaches, in other words, what caused [S.T.]'s injuries, you've tied that together?
>
> A. Yes, sir.
>
> Q. Okay. And that what happened to [S.T.] was as a result of those breaches?
>
> MR. SCHAFFER: Object as to form.
>
> THE WITNESS: Yes, sir.
>
> THE COURT: You objected to form. Sustained.
>
> Q. (By Mr. Hale) So the breach of -- the breaches that you've identified, were they the cause of injuries to [S.T.] with respect to [S.T.]?

> MR. SCHAFFER: Object to form.
>
> MS. MULLIN: Join.
>
> THE COURT: It should be direct and proximate cause.
>
> Q. Direct and proximate cause to [S.T.]
>
> MR. SCHAFFER: Objection.
>
> MS. MULLIN: Join
>
> THE COURT: Overruled.

(Aug. 17, 2016 Vol. 3 at Tr. at 584-85.) The court is again clarifying the boundaries of what the witness can testify to. This is not a compelling example of bias. This exchange may be a situation in which appellees' counsel made a mistake, appellants objected, and the court sided with appellants.

{¶ 62} Appellants further argue that another instance of the court clarifying the limitation of a witness testimony is a compelling example of bias:

> MR. SCHAFFER: Object, Your Honor.
>
> THE COURT: Let's get his opinions within the proper question format.
>
> MR. HALE: Okay.
>
> Q. (By Mr. Hale) do you have an opinion about
>
> THE COURT: Doctor, all your opinions you're going to give in this case have to be within a reasonable degree of medical probability. So any opinion you give has to be more likely than not. If you can't give it that way, don't give an opinion. If you give an opinion, can you assure the jury it will be within a reasonable degree of medical probability?

(Aug. 18, 2016 Vol. 4 at Tr. at 869.) This is not a compelling example of bias. The court is clarifying an ambiguity and controlling the proceedings.

{¶ 63} Appellants also argue that it was improper for the court to allow a witness, Helen Woodard, to recalculate damages so as not to confuse the jury. It is reasonable for the trial court to want the jury to hear a final dollar value of damages the life care planner

was testifying to. The delay in the proceeding to allow for the recalculation was not evidence of bias.

{¶ 64} Appellants separately argue that the court improperly interrupted the cross-examination of one of appellees' witnesses. Appellants argue that the court changed a question about probability of developing SJS on a properly titrated dose of Lamictal into a question about possibility of developing SJS. This argument is without merit. The court gave appellants' counsel ample opportunity to clarify the line of questioning and to have the witnesses answer appellants' questions to counsel's satisfaction.

{¶ 65} We find that the trial court did not abuse its discretion when interrogating various witnesses during the trial. We must initially presume that the trial court is not biased and the transcript does not show compelling evidence to overcome these presumptions.

{¶ 66} The second assignment of error is overruled.

## VIII. THE TRIAL COURT PROPERLY EXCLUDED DR. FRANZ

{¶ 67} In the third assignment of error, appellants argue that the trial court improperly excluded Dr. David Franz, M.D., from testifying for the defense at trial. Appellants claim that Dr. Franz's testimony is not cumulative and that his abilities and experience in prescribing Lamictal off-label and off-dosing provided additional details and insight.

{¶ 68} The admission or exclusion of evidence is generally within the sound discretion of the trial court, and a reviewing court may reverse only on the showing of an abuse of that discretion. *Peters v. Ohio State Lottery Comm.*, 63 Ohio St.3d 296, 299 (1992).

{¶ 69} "Evid.R. 403(B) provides that relevant evidence is not admissible if its probative value is substantially outweighed by consideration of undue delay or needless presentation of cumulative evidence, and a trial court has the discretion to exclude expert testimony where the testimony would not assist the trier of fact." *Holman v. Shiloh Grove L.P.*, 10th Dist. No. 15AP-228, 2016-Ohio-2809, ¶ 16, citing *Bostic v. Connor*, 37 Ohio St.3d 144 (1988), paragraph three of the syllabus. *See State v. Campbell*, 69 Ohio St.3d 38, 51 (1994) ("Evid.R. 403(B) does not require exclusion of cumulative evidence. The court has discretion to admit or exclude it. We find no abuse of discretion and hence overrule this

proposition."). "Cumulative evidence is additional evidence of the same kind to the same point." *Kroger v. Ryan*, 83 Ohio St. 299 (1911), paragraph one of syllabus.

{¶ 70} The trial court precluded Dr. Franz from testifying on Friday, August 26, 2016. The trial court's reasoning was that the testimony was cumulative. Dr. Prince, who prescribes Lamictal extensively in his practice, had already testified for the defense about treating mood disorders with Lamictal, how there are no guidelines for doing so, and it depends on experience. Dr. Prince, a pediatric psychiatrist, said that he was familiar with the pharmacological effects of Lamictal. The trial court concluded after hearing from defense counsel that Dr. Franz, a pediatric neurologist, would not be able to add anything to the prior testimony.

{¶ 71} The trial court also admonished defense counsel for the inability to coordinate their witness availability. Dr. Franz was apparently available to testify on Tuesday, August 23, 2016, and would not be available again until Friday, August 26, 2016. The trial court made its decision on Wednesday, August 24 that the testimony would be cumulative.

{¶ 72} The trial court did not abuse its discretion in determining that Dr. Franz's testimony would be cumulative. It did not act unreasonably, arbitrarily, or unconscionably.

{¶ 73} The third assignment of error is overruled.

## IX. THE TRIAL COURT PROPERLY QUALIFIED EXPERT WITNESSES TO TESTIFY

{¶ 74} In the seventh assignment of error, appellants argue that the legal competency of Drs. Kaye and Arrendondo was never established pursuant to Evid.R. 601(D) leaving their liability opinions defective and incompetent.

{¶ 75} Evid.R. 601(D) specifies that only those who are licensed to practice medicine and who devote at least one-half of their professional time to the active clinical practice of medicine or instruction in an accredited school may testify in a civil action on a physician's liability with respect to the diagnosis, care or treatment of a person. *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, ¶ 2.

{¶ 76} "A trial court has discretion to determine whether a witness is competent to testify as an expert, and the trial court's decision will not be reversed absent a clear showing that the court abused its discretion." *Id.* at ¶ 19, citing *McCrory v. State*, 67 Ohio St.2d 99, 105 (1981), citing *In re Ohio Turnpike Comm. v. Ellis*, 164 Ohio St. 377 (1955), paragraph eight of the syllabus; *Alexander*, 56 Ohio St.2d 155 (1978); *State v. Maupin*, 42 Ohio St.2d 473 (1975); *Akron v. Pub. Util. Comm.*, 5 Ohio St.2d 237 (1966); and *Tully v. Mahoning Express Co.*, 161 Ohio St. 457 (1954).

{¶ 77} It is a general rule that the expert witness is not required to be the best witness on the subject. *Alexander*. "The test is whether a particular witness offered as an expert will aid the trier of fact in the search for the truth." *Id.* at 159. "[A] witness from a school or specialty other than that of the defendant physician may qualify as an expert witness if he demonstrates sufficient knowledge of the standards of the defendant's school and specialty enabling him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards." *Ishler v. Miller*, 56 Ohio St.2d 447, 453 (1978).

{¶ 78} Appellants argue that Dr. Kaye was never qualified as a competent witness under Evid.R. 601(D). Dr. Kaye testified that he is a professor of anesthesia and pharmacology at Tulane University; an editor on a journal; edits many medical books; and serves on committees including an advisory board for the FDA. (Tr. at 537-39.) The trial court declared Dr. Kaye an expert witness and allowed him to express his opinions regarding pharmacology and drugs. However, before Dr. Kaye testified, the court reminded the parties outside the presence of the jury that a pair of rulings on appellees' motions had already been issued on this matter.

{¶ 79} The April 22, 2016 ruling prevented Dr. Kaye from testifying about Dr. Knobeloch's diagnosis of S.T. with bipolar disorder. Dr. Kaye is not a psychiatrist or pediatrician. The court found on the given state of the record that he did not have the expertise required to render an opinion on the diagnosis of bipolar disorder.

{¶ 80} The court agreed with appellants that Dr. Kaye could not opine or give an opinion about whether or not Dr. Knobeloch breached the standard of pediatric care.

{¶ 81} The trial court did indicate that Dr. Kaye had the expertise to give an opinion about whether Dr. Knobeloch should have advised appellants of the black box warning, whether he prescribed incorrect dosages, whether S.T. suffered an adverse drug reaction

and whether or not Dr. Knobeloch failed to diagnose and provide proper treatment for the alleged drug reaction. This testimony was within the realm of Dr. Kaye's expertise.

{¶ 82} The trial court overruled appellants' May 11, 2016 motion and stated that Dr. Kaye could testify as to the dosage and whether the over dosage caused the onset of SJS.

{¶ 83} During Dr. Kaye's testimony, at one point, he offered his opinion on the standard of care in diagnosing bipolar disorder. This was objected to and the trial court sustained the objection and told the jury to disregard the opinion.

> A. [Dr. Kaye]. I'm aware there are experts in pediatrics and pediatric psychiatry who have opined, which I agree it was not a proper diagnosis, on bipolar disease.
>
> Mr. Schaffer: Objection.
>
> * * *
>
> THE COURT: I'm going to sustain the objection and just ask the jury to disregard that. He's not a pediatrician, so I'm not going to let him testify about diagnosis. He can testify about whether the drug was appropriate or not.

(Aug. 17, 2016 Vol. 3 at Tr. 559-60.) The trial court was very careful to make sure that Dr. Kaye's testimony stayed within the limits of its prior rulings. Appellants argue that it was improper for Dr. Kaye to opine what Dr. Knobeloch's obligation to counsel the patient's family should be. However, that opinion related to the risks and benefits of a drug with a black box warning.

{¶ 84} The trial court reviewed Dr. Kaye's deposition testimony, credentials, qualifications, all other related evidence, the applicable law, and the parties arguments in rendering its opinion on Dr. Kaye's qualifications as an expert. It prohibited his testimony as to the standard of care in diagnosing bipolar disorder. When Dr. Kaye did offer his opinion on the standard of care, the trial court sustained the objection, told the jury to disregard the opinion, and pointed out to the jury that Dr. Kaye was not a pediatrician and could not testify about the diagnosis of patients.

{¶ 85} Dr. Kaye is a professor at Tulane University but he is not a pediatrician or psychiatrist. This court has thoroughly reviewed this issue, and the record reveals that he is a professor. The record does not indicate that Dr. Kaye devotes one-half of his professional time to the active clinical practice of medicine or instruction in an accredited

school. Evid.R. 601(D). The trial court did not abuse its discretion in outlining and enforcing the parameters of Dr. Kaye's testimony, or in finding that he was qualified to testify within certain limits.

{¶ 86} Appellants also argue that Dr. Arredondo failed to qualify as an expert under Evid.R. 601(D). Dr. Arredondo stated his qualifications: he is board certified in psychiatry and neurology, he has been in continuous clinical practice since his residency with some in child and adolescent psychiatry. Dr. Arredondo is the medical director at a non-profit that provides mental health services for adolescents where there is an education component to his work. He also maintains a private practice where, among other services, he assesses youth who have been seen by other people, but it is not clear what the diagnosis might be or what the right treatment is. The trial court did not abuse its discretion in qualifying Dr. Arredondo as an expert and qualified to testify as to Dr. Knobeloch's liability under Evid.R. 601(D).

{¶ 87} The seventh assignment of error is overruled.

## X. CONCLUSION

{¶ 88} Having overruled appellant's seven assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and BRUNNER, JJ., concur.

————————————